UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Case Number:  22-1748
_____

JASON KUTCHINSKI,
as parent and next friend to
H.K., a minor
Plaintiff-Appellant

v


FREELAND COMMUNITY SCHOOL DISTRICT;
MATTHEW A. CAIRY, in his official and individual capacity; and
TRACI L. SMITH, in her official and individual capacity
Defendants-Appellees
_____

ON APPEAL FROM THE U.S. DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN-SOUTHERN DIVISION
CASE NUMBER: 19-13810
HONORABLE SEAN F. COX. DISTRICT COURT CHIEF JUDGE
_____

**<u>DEFENDANTS – APPELLEES' BRIEF ON APPEAL</u>**

**ORAL ARGUMENT REQUESTED**

PREPARED BY:
GREGORY W. MAIR (P67465)
Attorney for Defendants
300 St. Andrews Road, Suite 302
Saginaw, MI  48638
(989) 790-0960
gmair@owdpc.com

i

## <u>DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST</u>

Defendants – Appellees make the following disclosure pursuant to FRAP 26.1 and 6 Cir.R. 26.1:

1.  Are Defendants – Appellees a subsidiary or affiliate of a publicly owned corporation?

**No.**

2.  Is there a publicly owned corporation, not a party to the appeal that has a financial interest in the outcome?

**No.**

# **TABLE OF CONTENTS**

Table of Authorities……………………………………………………. iv

Statement in Support of Oral Argument …………………………………….. vi

Statement of Jurisdiction …………………………………………………...1

Statement of Issues Presented on Appeal …………………………………… 2

Statement of the Case ………………………………………………………3

Summary of the Argument …………………………………………… 12

Argument …………………………………………………………... 14

     I.    The District Court correctly held that Defendants-Appellees did not violate H.K.'s first amendment rights……………………………… 14

     II.   The District Court correctly held that Rule #10 Of Defendants-Appellees' Student Handbook was not void for vagueness and overbreadth …………………………………………………… 24

Conclusion ………………………………………………… 29

Certificate of Compliance ……………………………………………….. 30

Statement of Relevant Originating Court Documents ……………………….31

# INDEX OF AUTHORITIES

## CASES                                                    PAGES

*Bethel School Dist. No. 403 v. Fraser*
        478 U.S. 675, 684 (1986)………………………………..14, 25, 27, 28

*Brown v. Entertainment Merchants Assn.*
        564 U.S. 786, 794 (2011)…………………………………………………..14

*Doe v. Hopkinton Public Schools*
        19 F.4th 493, 505 (1st Cir. 2021)………………………………13, 15, 16, 17

*Doninger v. Niehooff*
        527 F.3d 41, 45 (2nd Cir. 2008)………………………………………..17, 22

*Hazelwood School Dist. v. Kuhlmeier*
        484 U.S. 260, 266 (1988)…………………………………………………14

*J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*
        650 F.3d 915, 929 (3d Cir. 2011)………………………………………..21,23

*Kowalski v. Berkley County Schools*
        652 F.3d 565 (4th Cir. 2011)……………………………….13, 16, 17, 25, 28

*LaVine v. Blaine School District*
        257 F.3d 981, 989 (9th Cir. 2001)……………………………………………15

*Lowery v. Euverard*
        497 F.3d 584, 596 (6th Cir. 2007)………………………………………..15, 23

*Mahanoy Area School District v. B.L. ex rel. Levy*
        141 S.Ct. 2038, 2044 (2021)…………………………...12, 15, 18, 19, 20, 21

*Morse v. Frederick*
        551 U.S. 393, 428 (2007)………………………………………………..23

*New Jersey v T.L.O*
        469 U.S. 325, 340 (1985)………………………………………………..25

*Sypniewski v. Warren Hills Reg'l Bd. Of Educ*.
    307 F.3d 243, 266 (3d Cir. 2002)……………………………………...25, 27


*Tinker v. Des Moines Independent Community School Dist.*
    393 U.S. 503, 506 (1969)…………………………..13, 14, 18, 19, 20, 22, 23


*Whitman v. Am. Trucking Associations*
    531 U.S. 457, 468 (2001)………………………………………………….20

## <u>COURT RULES AND STATUTES</u>

28 U.S.C. § 1331……………………………………………………………1
28 U.S.C. § 1291……………………………………………………………1
47 U.S.C. §230………………………………………………………………20
MCL 769.12…………………………………………………………………28
FRAP 26.1…………………………………………………………………..ii

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Defendants – Appellees respectfully request that this matter be submitted for oral argument before this Honorable Court pursuant to Sixth Circuit Rule 34(a). Oral argument in this case will serve as a productive tool in helping to clarify the issues before the Court. Specifically, it will allow the parties to clarify questions regarding the record in this case and the testimony of educators with regard to the factual circumstances that are at the legal and factual core of this matter. The opportunity to address these details in greater detail to this Honorable Court will aid in the decision-making process and allow the Court to resolve any further questions at their discretion, should the need arise.

## <u>STATEMENT OF JURISDICTION</u>

Defendants – Appellees state that the District Court had jurisdiction over this case pursuant to 28 U.S.C. § 1331 as this case involved federal questions under the United States Constitution.

On August 4, 2022, the District Court GRANTED Defendants-Appellees' Motion for Summary Judgment, and fully and finally adjudicated the last pending claims in this matter.  A Judgment was entered on August 22, 2022. This Court has jurisdiction to review that Judgment pursuant to 28 U.S.C. § 1291. Appellants timely noticed their appeal on August 22, 2022.  This Court, therefore, may exercise jurisdiction over this appeal.

## STATEMENT OF ISSUES PRESENTED ON APPEAL

I.  **WHETHER THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS WHEN IT HELD THAT DEFENDANT SCHOOL DISTRICT WAS ABLE TO REGULATE OFF-CAMPUS SPEECH WHEN THE SPEECH OR CONDUCT CAUSED A SUBSTANTIAL AND MATERIAL DISRUPTION TO THE OPERATIONS OF THE SCHOOL AND A REASONABLE FORECAST OF CONTINUED DISRUPTION, AND WHEN SPEECH CONTAINED HARASSMENT TARGETING PARTICULAR INDIVIDUALS AND THREATS AIMED AT TEACHERS OR OTHER STUDENTS?**

   **Defendants-Appellees would answer: "Yes."**
   **Plaintiff-Appellant would answer: "No."**
   **District Court of Eastern Michigan would answer: "Yes."**

II. **WHETHER THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT TO DEFENDANTS AND NOT PLAINTIFF WHEN IT HELD THAT RULE #10 OF DEFENDANTS' SCHOOL HANDBOOK WAS NOT UNCONSTITUTIONALLY VOID FOR VAGUENESS AND OVERBREADTH.**

   **Defendants-Appellees would answer: "Yes."**
   **Plaintiff-Appellant would answer: "No."**
   **District Court of Eastern Michigan would answer: "Yes."**

## STATEMENT OF THE CASE

Plaintiff's minor, H.K., was a 14-year-old student at Freeland High School in May of 2019. **(Plaintiff's Amended Complaint, RE 12, PageID 151.)** Freeland High School is part of the larger Freeland Community School District led by Defendant, Matthew Cairy, as Superintendent and Defendant, Traci Smith, as Principal. **(Sealed Deposition Transcript of Traci Smith, RE 49,   pg. 5-8.)**[1] Amongst the educators at that school was Mr. Steven Schmidt, a biology teacher. **(Sealed Deposition Transcript of Traci Smith, RE 49,  pg. 8)**

Early in the morning of May 12, 2019, Principal Smith received word from Mr. Schmidt that a student had alerted him to an Instagram account which was impersonating him and that there were a series of strange posts, including a number of posts containing violent and sexually harassing content regarding current and former teachers and students of Freeland High School.  The District Court Opinion and Order describes some of the posts as follows:

> 3 – picture of another student with the caption "Glad this sicko is out of our school. #assault #blessed
>
> 4 – picture of Steven Schmidt with his wife and child with the caption "Just #gangbanged my wife with 4 other men in the back of Arby's #notmykid #14inches"
>
> 5 – picture of another female teacher, Chelsea Howson, with the caption

---

[1] Plaintiff-Appellant correctly notes that many of the Depositions in this matter were sealed to protect the confidential information of minors. Accordingly, all sealed transcripts will be cited in this manner per Clerk instruction.

"Best sex in Pet Smart #throbbing #14inches #raw" (Believed to insinuate affair between teachers)

6 – video of an unknown female giving oral sex with the caption "Might have to cheat on my wife #big #14inches"

7 – picture of teacher Trey Anderson with two unknown students. Caption reads "I will find and kill @treyanderson – im going to strangle him with my barehands until he is barely conscious, then let go. Once he is awake im gonna run him over with my fucking car and crush his skull into a million pieces #lol @elite_edge

8 – picture of teacher Trey Anderson with his cat. Caption reads "I could beat up @treyanderson and anyone else in @elite_edge and then curb stomp his cat #gains@peta

**(Opinion and Order of District Court, RE 62, PageID 1171-72)**. Mr. Schmidt confirmed that he had nothing to do with the account and that none of the posts contained true information. **(Sealed Deposition Transcript of Steven Schmidt, RE 49, pg. 25.)** The account displayed the following on the cover page accompanied by a profile picture of Mr. Schmidt:

Steven Schmidt
Biology teacher at Freeland High School
1 Loving Wife #lovers married in 2016
Father of 2 beautiful twins #blessed and 1 girl
#growingup

**(Opinion and Order of District Court, RE 62, PageID 1171)** The Account also bore the name "schmidtmsteven".[2] **(Opinion and Order of District Court, RE 62,**

---

[2] Plaintiff-Appellant repeatedly makes the claim that the name "Abdul Rashid" was associated with the account. The District Court correctly noted that "Abdul Rashid"

4

PageID 1170)

Upon going into school the next morning, Principal Smith launched an investigation into the Instagram account, which was still active. **(Sealed Deposition Transcript of Traci Smith, RE 49, pg. 34.)** She began by contacting a local law enforcement officer given the violent nature of the posts. **(Sealed Deposition Transcript of Traci Smith, RE 49, pg. 38-40.)** At that time, she began receiving calls and other communication from teachers indicating that students were disrupting class to discuss the content of these posts. **(Sealed Deposition Transcript of Traci Smith, RE 49, pg. 35-36.)** From there, she conducted an investigation into the posts as a violation of the school's rules. **(Sealed Deposition Transcript of Traci Smith, RE 49, pg. 34.)** Principal Smith pulled several students from classrooms to discuss the posts when she identified them discussing the posts in class. **(Sealed Deposition Transcript of Traci Smith, RE 49, pg. 45.)** Freeland High School has a policy forbidding cell phone usage in class. **(Sealed Deposition Transcript of Traci Smith, RE 49, pg. 43-44.)** The disruption, related to the account and its posts, was so substantial that educators were unable to enforce this rule, and students had phones pulled out discussing and viewing the account. **(Sealed Deposition Transcript of Traci Smith, RE 49, pg. 43-44.)**

---

was the name given to Instagram in order to create the account, but that the name was not publicly facing in any respect, despite Plaintiff-Appellant's assertions otherwise.

Principal Smith finally identified a student, L.E., who was able to identify the students involved with the account. **(Sealed Deposition Transcript of Traci Smith, RE 49, pg. 47.)** He named H.K., as well as two other boys, K.L. and L.F. **(Sealed Deposition Transcript of Traci Smith, RE 49, pg. 47.)** She met with all three (3) boys in her office. **(Sealed Deposition Transcript of Traci Smith, RE 49, pg. 43-59.)** These discussions proved fruitful, as it was eventually established that H.K. had created the account and shared the password with the two (2) other boys so they could all have access to create, edit and delete posts as they saw fit. **(Sealed Deposition Transcript of Traci Smith, RE 49, pg. 60-65.)** The three (3) students provided general identifications of what posts were created by what student, but the identifications did not cleanly overlap. **(Sealed Deposition Transcript of Traci Smith, RE 49, pg. 60-65.)** H.K. also admitted that he took part in authorizing people to "follow" the account even after seeing the posts from his friends. **(Sealed Deposition Transcript of H.K., RE 49, pg. 10-14.)** He testified that he retained the ability to delete the account at all times and, in fact, did so during school hours on May 13, 2019. **(Sealed Deposition Transcript of H.K., RE 49, pg. 10.)**

The impact caused by the account and its posts disrupted the school operations in a number of different classrooms of the school. Specifically, classrooms led by Mr. Schmidt, Ms. Howson, and Ms. Wheatley were affected. **(Sealed Deposition Transcript of Steven Schmidt, Chelsea Howson, and Carrie Wheatley, RE 49).**

The account created substantial unauthorized discussions between students, including students using phones in class, students disrupting the flow of lesson plans to ask questions of the educators about the content of the posts, and students confronting and engaging H.K., K.L., and L.F. **(Sealed Deposition Transcript of Steven Schmidt, RE 49, pg. 30-55.) (Sealed Deposition Transcript of Chelsea Howson, RE 49, pg. 16, 19-23)**.

During first hour, Mr. Schmidt was approached by two students asking about the account. **(Sealed Deposition Transcript of Steven Schmidt, RE 49, pg. 29-30.)** Mr. Schmidt testified that the account impacted his teaching on that day. **(Sealed Deposition Transcript of Steven Schmidt, RE 49, pg. 31-34.)**

> A. I mean, to be fair, the whole first day back from work was really difficult. Like I'd mentioned, the posts were, you know, very like sexually explicit and said some pretty hurtful things, you know. And I had suspected it was probably a student, given the fact that there were other teachers at the school, and their grade level and their coaching level involved.
>
> So it was hard going and trying to make sure I was doing my best in front of students that have been the ones that were probably doing this to me in front of– on social media. I mean, it was tough getting – just being in the right head space to show up for work.
>
> Q. Well - -
>
> A. And then right when I started class, thinking maybe we can just make this a normal day. That's why I remember the first hour event so much is like, I thought I'm going to be able to get through today without worrying about it, and it's going to be fine. And then the two kids approached me, and it was like it kind of threw me off for the rest of the day from there.

. . .

A. I mean, teaching is highly personal. After being confronted I was less likely to engage with students out of fear that they were going to try to bring it up too. I was more likely to just kind of let things slide. Like normally I try to be very proactive in answering questions, I needed to kind of just get through. So, I mean, really that was what I -

**(Sealed Deposition Transcript of Steven Schmidt, RE 49, pg. 31-38.)** Mr. Schmidt tried to avoid conversations with students about the Instagram account all day.  **(Sealed Deposition Transcript of Steven Schmidt, RE 49, pg. 37-38.)** During the sixth period, two students were pulled out of class and "students were asking about where these two students were, like kind of jokingly, like everybody knew what was going on kind of thing, but [Mr. Schmidt] didn't know what was going on." **(Sealed Deposition Transcript of Steven Schmidt, RE 49, pg. 42.)** Throughout the day, students in Mr. Schmidt's biology classes "were talking about stuff that wasn't bio[.]" **(Sealed Deposition Transcript of Steven Schmidt, RE 49, pg. 48-49.)**

Mrs. Howson testified that "students were whispering about the incident, mainly in the afternoon after it had sort of, in my experience, as it had sort of spread around." **(Sealed Deposition Transcript of Chelsea Howson, RE 49, pg. 16.)** Mrs. Howson testified that there was a commotion in her fifth period, freshman, English class. **(Sealed Deposition Transcript of Chelsea Howson, RE 49, pg. 19-22.)**

A. I, from what I remember, observed, like I said from what I remember we were studying Romeo and Juliet, and they were in groups, seated in their desks in groups. And [L.F.] was talking to his group about the

incident. I - - they were kind of gossiping, looking at me, looking back at [L.F.]. It was obvious what they were discussing.

**(Sealed Deposition Transcript of Chelsea Howson, RE 49, pg. 21.)** Mrs. Howson told the students to get back on task and "they got back to their work, but they were still kind of having the conversation because I didn't explicitly ask them to stop talking about that topic." **(Sealed Deposition Transcript of Chelsea Howson, RE 49, pg. 22-23.)** Mrs. Howson testified that she "felt incredibly humiliated the entire day" and that she "knew the students knew about it, and [she] was humiliated to even bring the topic up." **(Sealed Deposition Transcript of Chelsea Howson, RE 49, pg. 23.)** Mrs. Howson felt "like [she] was a target that day" and that she "was just completely consumed by anxiety." **(Sealed Deposition Transcript of Chelsea Howson, RE 49, pg. 25.)** When Plaintiff's counsel asked Mrs. Howson if she was being overly sensitive, Mrs. Howson testified:

> A. No, I don't think so at all. I think, actually as a female educator it was even more severe just because of the way different things in the news have come across with female teachers and accusations.
>
> The previous teacher, to my knowledge, that had held the position before we had an – had an incident with a student, and I just felt like there would be assumptions made about my character over which I had no control. Things spread very quickly, and people who didn't know me or weren't familiar enough with me would make assumptions about my character and what I would do and where the source of that post may have come from.
>
> Why would the student think to make that post? What gave the student the feeling that that was okay? And then to deal with, well, what do people think of the post? All of which stemmed from the account itself,

9

which hadn't been created, it would have never happened.

**(Sealed Deposition Transcript of Chelsea Howson, RE 49, pg. 42.)** Ms. Howson's emotions built up throughout the day, and she was brought to tears in the afternoon.

**(Sealed Deposition Transcript of Chelsea Howson, RE 49, pg. 54.)**

Mrs. Howson further testified that the account impacted her teaching. Specifically, she testified that: "[she] wouldn't say the tasks that needed to be accomplished were fully accomplished that day in the time period that [she] had allotted." **(Sealed Deposition Transcript of Chelsea Howson, RE 49, pg. 33.)** She did not remember which specific tasks were not fulfilled, but after 11 years of teaching experience, "[she knew] how long activities take, and any kind of deviation from the time can sort of put us into the next day" and "[she knows] that disruptions where students aren't on task, logistically speaking, take away from the time that is allotted to complete a task." **(Sealed Deposition Transcript of Chelsea Howson, RE 49, pg. 33.)**

A student approached Miss Carrie Wheatley ("Miss Wheatley") because Mrs. Howson was upset and crying in English class because of what was posted about her on the Instagram account. **(Sealed Deposition Transcript of Carrie Wheatley, RE 49, pg. 11-14.)** Miss Wheatley told the student to report it to Principal Smith. **(Sealed Deposition Transcript of Carrie Wheatley, RE 49, pg. 11-14.)**

Contrary to Plaintiff-Appellant's assertions, the reaction to the account

objectively disrupted the lesson plans for that week as set out by the educators and caused great personal embarrassment, anxiety, and frustration to the educators. **(Sealed Deposition Transcript of Steven Schmidt, RE 49, pg. 11-14.) (Sealed Deposition Transcript of Chelsea Howson, RE 49, pg. 23-25.) (Sealed Deposition Transcript of Carrie Wheatley, RE 49, pg. 11.)** Several of these educators were approached by students asking about the posts and felt compelled to report the same to Principal Smith. **(Sealed Deposition Transcript of Steven Schmidt, RE 49, pg. 15.) (Sealed Deposition Transcript of Chelsea Howson, RE 49, pg. 30.) (Sealed Deposition Transcript of Carrie Wheatley, RE 49, pg. 17.)**

Upon conclusion of the investigation, all three (3) students were placed on a five (5) day suspension pending further review. **(May 13, 2019 Ltr, RE 51-6, PageID# 1010.)** H.K. received a hearing where he was eventually assessed a ten (10) day suspension for his conduct. **(Decision Letter, RE 51-15, PageID# 1053.)** Ultimately, he was suspended for a number of different rules and violations, including Rule No. 5, 10, 21, and 24 of the District's Handbook, as well as the school's harassment policy. **(Sealed Deposition Transcript of Traci Smith, RE 49, pg. 66-80.) (Freeland Handbook, RE 43-6, PageID# 760-61, 765**.) In Superintendent Cairy's letter informing H.K.'s parents of the outcome of the hearing, he wrote that:

> [H.K.] has received a ten (10) day suspension for his actions on May 11-13, 2019, including: gross misbehavior for his posting a fake

11

Instagram account impersonating a teacher (under an assumed name), posting to that account as the teacher, and sharing the username and password with other students.

**(Decision Letter, RE 51-15, PageID# 1053.)**

The Instant Lawsuit followed that punishment. Defendants-Appellees eventually moved for summary judgment on both counts. **(MSJ, RE 37)**. Plaintiff moved for summary judgment on just the void-for-vagueness claim. **(Partial MSJ, RE 40.)** After a briefing hearing, the District Court granted summary judgment for Defendants. **(Opinion and Order of District Court, RE 62.)**

## SUMMARY OF THE ARGUMENT

The District Court correctly held that Defendants-Appellees did retaliate against H.K's First Amendment Rights, and also correctly held that Rule #10 of the Freeland Community School District's Handbook was not void for vagueness or overbreadth. Defendants retained their significant interest in regulating H.K.'s off campus speech because the facts of this matter are a textbook example of the interest factors set out in *Mahanoy Area School District v. B.L. ex rel. Levy*, including "serious or severe bullying or harassment targeting particular individuals" and "threats aimed at teachers or other students." 141 S.Ct. 2038, 2044 (2021). The off-campus nature of H.K.'s speech does not outweigh the School's Interest in regulating said speech, because it was not of a political or religious nature and was not a mere "unpopular opinion" that should be protected. H.K. can be held responsible for the

speech of his accomplices because he exercised active control of the page, authorized followers, and facilitated a platform for the speech to be disseminated. *See Doe v. Hopkinton Public Schools*, 19 F.4th 493, 505 (1st Cir. 2021); and *Kowalski v. Berkley County Schools*, 652 F.3d 565 (4th Cir. 2011). Furthermore, a material disruption under the *Tinker v. Des Moines Independent Community School Dist.*, standard was present in the instant case, on top of the presence of a reasonable forecast of a substantial disruption yet to occur. 393 U.S. 503, 506 (1969).

Additionally, the District Court correctly decided that Rule #10 of the School's Handbook was not void for vagueness or overbreadth, because the rule provided fair notice of the conduct that it would prohibit.

# ARGUMENT

## I.   THE DISTRICT COURT CORRECTLY HELD THAT DEFENDANTS-APPELLEES DID NOT VIOLATE H.K.'S FIRST AMENDMENT RIGHTS.

Defendants-Appellees validly exercised their right as a school district to regulate H.K.'s off-campus conduct and speech, as the same caused a substantial and material disruption to the school day, and a reasonable forecast of future disruption. The account at issue contained speech which targeted specific individuals and contained harassing messages, including specific and detailed threats.

Students do not "shed their constitutional rights to freedom of speech or expression," even "at the school house gate." *Tinker*, 393 U.S. at 506 ; *see* also *Brown v. Entertainment Merchants Assn*., 564 U.S. 786, 794 (2011). "But we have also made clear that courts must apply the First Amendment 'in light of the special characteristics of the school environment.'" *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) "One such characteristic, which we have stressed, is the fact that schools, at times, stand in loco parentis, i.e., in the place of parents." *See Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986). "Conduct by the student, in class or out of it, which for any reason -- whether it stems from time, place, or type of behavior -- materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Tinker*, 393 U.S. at 513.  "The

school's regulatory interests remain significant in some off-campus circumstances. The parties' briefs, and those of *amici*, list several types of off-campus behavior that may call for school regulation. These include serious or severe bullying or **harassment targeting particular individuals; threats aimed at teachers or other students** . . ." *Mahanoy,* 141 S. Ct. at 2045 (emphasis added). "[s]chool officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place." *Lowery v. Euverard*, 497 F.3d 584, 596 (6th Cir. 2007). "Forecasting disruption is unmistakably difficult to do. Tinker does not require a certainty that disruption will occur, but rather the existence of facts which might reasonably lead school officials to forecast substantial disruption." *LaVine v. Blaine School District*, 257 F.3d 981, 989 (9th Cir. 2001).

## A. CULPABILITY FOR INDIRECT SPEECH

The District Court laid out a series of cases which discuss the authority of a School to punish students for speech made by other students, when the same is made as part of a collective effort. They noted the following: "circuit courts around the country have held that a school can punish a student for participating in online group bullying, even where the disciplined student may not have been the main offender." **(Opinion and Order of District Court, RE 62, PageID# 1186.)**

In *Doe v. Hopkinton Public Schools*, 19 F.4th 493, 505 (1st Cir. 2021), the disciplined students were members of a Snapchat group conversation that bullied a

fellow student. Similar to Plaintiff, the students argued that they did not engage in the offending conduct and therefore their punishment violated the First Amendment. *Id*. at 506. The First Circuit analyzed whether there was a causal connection between the students' speech and the bullying that invaded the other students' rights. *Id*. at 506-507. The *Hopkinton* court held that the school did not violate students' First Amendment rights and stated: "Children often bully as a group. The children who stand on the sidewalk and cheer as one of their friends shakes down a smaller student for his lunch money may not be as culpable, but they are not entirely blameless." *Id*. at 507. The *Hopkinton* court noted that the school reasonably concluded that the students' "messages and participation in the group fostered an environment that emboldened the bullies and encouraged others in the invasion of [the bullied student's] rights." *Id*. at 508.

In *Kowalski v. Berkley County Schools*, 652 F.3d 565 (4th Cir. 2011), the disciplined student created and posted to a MySpace page, which was dedicated to ridiculing a fellow student. *Id*. at 567. Other students posted comments and photographs of the bullied student. *Id*. at 568. The Fourth Circuit concluded that the MySpace page that the student created "functioned as a platform for [the disciplined student] and her friends to direct verbal attacks towards classmate" and held that "the school was authorized to discipline [the student] because her speech interfered with the work and discipline of the school." *Id*. at 572-574.

It is also not unprecedented for a school to punish a student who disparaged educators online. In *Doninger v. Niehooff*, 527 F.3d 41, 45 (2nd Cir. 2008), the disciplined student, who was on the Student Council, wrote a blog post disseminating misleading information about a school event, called school administrators "douchebags," and encouraged her fellow students to try and "piss off" the school administrator more. *Id*. Several other students posted comments on her blog post, one of which called the school administrator a "dirty whore." *Id*. The Second Circuit reasoned that the student's "conduct posed a substantial risk that LMHS administrators and teachers would be further diverted from their core educational responsibilities by the need to dissipate misguided anger or confusion" and ultimately held that the school did not violate the student's First Amendment rights by disciplining her. *Id*. at 51-52.

The District Court analyzed these cases and stated its finding eloquently:

> Here, just as in *Kowalski*, H.K. created the Instagram account that functioned as the online platform through which K.L. and L.F. made the harassing posts. H.K. was the one who set up the account to impersonate Mr. Schmidt. H.K. took a picture from Mr. Schmidt's personal Facebook page to make the account look more like it was Mr. Schmidt. H.K. knew his friends were publishing the harassing posts and he retained control over who could follow the account. Just as in *Hopkinton*, H.K's actions "fostered an environment that emboldened the bullies." This demonstrates a clear causal connection between H.K.'s speech and the harassment that invaded the rights of Mr. Schmidt, Mr. Anderson, Mrs. Howson, and the former cognitively impaired student. As such, the Court finds that the school could discipline H.K. for his involvement with the Instagram account.

17

(Internal citations omitted) (**Opinion and Order of District Court, RE 62, PageID# 1187-1186.**) Certainly, H.K. created the account for the purpose of hosting the threatening and harassing conduct and enlisted help to do so. Even if H.K. himself did not author the exact language of all the posts, he refrained from deleting the posts, controlled access to the posts, and actively laughed with his accomplices regarding the posts, effectively suborning and granting tacit approval of the content, to the point of ownership and editorial control. Furthermore, he ultimately exercised that speech by deleting the profile during school hours. By suspending H.K. for this speech and conduct, the Freeland Community School District was effectively exercising its interest in regulating threatening, harassing, and targeted speech. By exercising that ownership and editorial control while on campus, he spurred further discussion and disruption. The District Court correctly concluded and did not err when they held that the entirety of the speech at issue with the account could be attributed to H. K. for the purposes of punishment under the school's rules.

### B. MATERIAL DISRUPTION UNDER *TINKER*

The standard in *Tinker* has held as the rule for school regulation of speech for decades. The Supreme Court recently decided *Mahanoy Area Sch. Dist. v. B. L.,* a case which threatened to modify that standard and draw new battlelines in a settled area of law with a bright line rule. The Supreme Court elected to retain the *Tinker* standard, opting to elaborate on the facts and circumstances of *Mahanoy* instead. In

doing so, they shaped and sculpted the *Tinker* standard even further. The *Mahanoy* Court set out specific instances where a school district would retain an interest in regulating off campus speech, therefore, triggering a *Tinker* test application.

The *Mahanoy* Court ultimately held that the district did not have enough of a significant interest in the speech to justify regulation, and that the speech made by the plaintiff did not rise to the level of a substantial disruption. The Court found that plaintiff's message – "Fuck school fuck softball fuck cheer fuck everything;" did not implicate one of the "special interests" laid out by the Court, and that the 5-10 minutes of discussion in class, and the negative opinions of the plaintiff's teammates did not constitute a significant disruption.

The instant case would certainly not survive the scrutiny of the *Mahanoy* Court.  Freeland Community School District certainly has a special interest in regulating speech that constituted targeted and threatening harassment of full-time and part-time faculty, explicit threats made toward a faculty member, and sexual harassment of educators and their families.  The posts from the account at issue are exactly the kind of speech the *Mahanoy Area Sch. Dist. v. B.L* Court contemplated when they specifically carved out the exemptions in the majority opinion.  This would also be considered speech that occurred on campus, rendering an analysis under *Tinker* and *Mahanoy* unnecessary.  Regardless, even if the Court considers only his off-campus speech, this suspension was well within the valid power of the

District pursuant to the law set forth in *Tinker* and *Mahanoy*.

Plaintiff's reliance on § 230 of the Communications Decency Act, 47 U.S.C. § 230, is certainly without merit or applicability. That section provides a defense to **civil liability** for providers of "interactive computer services" against suits claiming that those providers are the publisher or speaker of content hosted on the service, as well as for actions taken to restrict access to "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable" material. First and foremost, Plaintiff and his minor are not being sued civilly for speech or conduct. To apply § 230 would be a factually baseless stretch of the statute which no Court has ever supported, and Congress did not originally intend. To quote the words of the late Justice Antonin Scalia, "Congress does not hide elephants in mouseholes." *Whitman v. Am. Trucking Associations,* 531 U.S. 457, 468 (2001).

Beyond the valid interest of the District in regulating the speech, they also had the prerequisite disruption necessary to justify an imposition of that interest. Indeed, the disruption far exceeded the disruption seen in *Mahanoy Area Sch. Dist. v. B.L.* The disruptive impacts of H.K.'s speech had a widespread impact upon the state of operations at Freeland High School. The impact could be seen in the lunchroom, as well as the classrooms of Mr. Schmidt, Ms. Howson, and Ms. Wheatley. The students at Freeland High School discussed the account relentlessly, causing the educators to field repeated questions, which eliminated their ability to assist students

in need of help with schoolwork.  This disruption was particularly injurious to Ms. Howson and Mr. Schmidt, who had been featured in some of the posts. The stress of the disruption forced Ms. Howson to tears in front of her students, at least one of whom went to another teacher to express their concern for Ms. Howson and the situation.

Plaintiff has cited a Third Circuit case dealing with a similar topic of fake social media accounts. In that case, the Court found that "general rumblings, a few minutes of talking in class, and some officials rearranging their schedules" did not constitute a substantial disruption. *See J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 929 (3d Cir. 2011).  Once again, the disruption in the instant case far exceeds the alleged disruption in cases like *Blue Mountain* and *Mahanoy*. Freeland educators have testified in their own right that their ability to teach adequately was compromised by the effect of the account on the student body. Certainly, a material disruption of classwork is most adequately measured by those doing the teaching. The District Court also noted that "[I]n *Blue Mountain*, the MySpace profile did not provide the principle's name, school, or location nor did it specifically target other people.  Here, the "schmidtmsteven" Instagram account was taken seriously by Freeland High School staff and students because it included so much personal identifiable information about Mr. Schmidt and specifically targeted the other teachers and the unnamed student." (**Opinion and Order of District**

**Court, RE 62, PageID# 1189-1190.)**

Regardless, Defendants-Appellees do not need to make an affirmative showing that a material disruption *actually* occurred to punish H.K. As the District Court aptly noted in their opinion:

> Based upon the reaction of the students and teachers to the highly targeted nature of the account, it was reasonable for Principal Smith to forecast a substantial disruption under Tinker. As in *Doninger*, the Instagram account "posed a substantial risk that [Freeland High School] would be further diverted from their core educational responsibilities by the need to dissipate . . . confusion" surrounding the account. 527 F.3d at 51.

(**Opinion and Order of District Court, RE 62, PageID# 1191.**) Therefore, even if it could not be said that a material disruption had occurred during the school day, it was reasonably foreseeable that disruption would have occurred if the Instagram page was left unaddressed.

Plaintiff-Appellant's contention that the disruption was caused or magnified by Principal Smith's investigation is meritless. The numerous cases cited by the parties and the District Court all stand for the idea that public schools have a right to investigate violations of school policy. If the investigation of the source of disruptions could not be attributed to the disruptions themselves, the disciplinary powers of the school would be rendered meaningless, and as the Court has said:

> Students will test the limits of acceptable behavior in myriad ways better known to schoolteachers than to judges; school officials need a degree of flexible authority to respond to disciplinary challenges; and the law has always considered the relationship between teachers and

> students special. Under these circumstances, the more detailed the
> Court's supervision becomes, the more likely its law will engender
> further disputes among teachers and students. Consequently, larger
> numbers of those disputes will likely make their way from the
> schoolhouse to the courthouse. Yet no one wishes to substitute courts
> for school boards, or to turn the judge's chambers into the principal's
> office.

*Morse v. Frederick*, 551 U.S. 393, 428 (2007). In short, Courts have long recognized

that deference to school administrators should be given on disciplinary matters under

school rules and codes. The *Lowery* Court addressed this specifically when they

stated: "Tinker does not require school officials to wait until the horse has left the

barn before closing the door." *Lowery* , 497 F.3d at 591–92.

The circumstances of the speech in this case make this principle even more

palpable. Justice D. Michael Fisher authored a poignant dissenting opinion in *Blue*

*Mountain*:

> Thus, even if J.S.'s post can be treated as a juvenile joke, it does not
> mean that the School District had to treat it as such. For **it is also**
> **eminently reasonable to treat accusations of sexual misconduct**
> **seriously.** I believe our Court errs when it tells a school district how it
> should handle violations of its policy that are of as serious and grave a
> matter as false accusations of sexual misconduct.

(emphasis added) 650 F.3d at 948.

Accordingly, Defendants-Appellees had the requisite special interest, and the

necessary material disruption and reasonable forecast of additional disruption to

justify the punishment assessed against H.K. for his role in the Instagram account.

No violation of H.K.'s First Amendment rights occurred, and the District Court did

not err in coming to that conclusion.  This Honorable Court must affirm the decision of the District Court to grant Summary Judgment to Defendants-Appellants on this issue.

## II. THE DISTRICT COURT CORRECTLY HELD THAT RULE #10 OF DEFENDANTS-APPELLEES' STUDENT HANDBOOK WAS NOT VOID FOR VAGUENESS AND OVERBREADTH.

Plaintiff-Appellant has asked this Court to reverse the holding of the District Court and declare Rule #10 of the Freeland High School Handbook unconstitutionally vague or overbroad on the basis that it does not adequately specify what conduct is forbidden.  This claim is ultimately of no consequence to the punishment that was dispensed to H.K., as H.K. was punished under multiple other rule violations in addition to Rule #10 and it is therefore, a moot issue.  The District Court addressed this question because Plaintiff was in part punished under Rule #10. The District Court did not err in its final conclusion that this claim is without merit when applied to the law.

The District Court correctly noted that the overbreadth argument was not addressed by the Parties, likely because of its complete lack of merit. Plaintiff-Appellants fail to address it again before this Court, and thus Defendant-Appellees will rely upon the well-founded decision of the District Court in that regard.

The gist of Plaintiff's argument regarding vagueness is that the phrase "gross misbehavior" is not sufficient to put the average student on notice of the prohibited

conduct under the rule. The full text of the rule is: "Students guilty of gross misbehavior, persistent disobedience or having habits detrimental to the school will be suspended or excluded from Freeland Schools." This rule contains three (3) separate clauses which serve to outline the conduct prohibited by the Rule. Only the first has been challenged by Plaintiff-Appellant.

While schools are required to provide students with some level of due process, "Maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures, and we have respected the value of preserving the informality of the student-teacher relationship." *Fraser*, 478 U.S. at 686 (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985)). Schools require this flexibility because "they need . . . to control such a wide range of disruptive behavior." *Sypniewski v. Warren Hills Reg'l Bd. Of Educ.*, 307 F.3d 243, 266 (3d Cir. 2002). "In other words, 'the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." *Kowalski*, F.3d at 575 (quoting *Fraser*, 478 U.S. at 686).

"Gross misbehavior" is by its nature made up of two (2) separate elements, that being the words "gross" and "misbehavior." Neither are vague, however, "gross" may be deemed subjective and placed in the discretionary hands of the administrators responsible for punishing such conduct. "Misbehavior" is essentially the word which Plaintiff's complaint of vagueness relies upon.

"Misbehavior" is simply not vague when you consider the placement of the word in the sentence, and the placement of that sentence amongst a list of rules and regulations.  Cambridge English Dictionary defines the word as "bad behavior, or behavior that breaks a rule."[3] This word, in the context of a school handbook, is clearly meant to mean a violation of any of the rules contained therein. The dictionary defines "gross" as "glaringly noticeable usually because of inexcusable badness or objectionableness."[4] When coupled with the word "gross," it is easy to see that this particular rule is meant to serve as notice to students that egregious violations of school rules will be subject to suspension or expulsion. The use of the rule in the instant case is consistent with this interpretation. In the letter sent to H.K. following his suspension, the rationale for the suspension was stated by Matthew Cairy as "gross misbehavior _**for**_ his posting a fake Instagram account impersonating a teacher (under an assumed name), posting to that account as the teacher, and sharing the username and password with other students." (emphasis added) **(Decision Letter, RE 51-15, PageID# 1053.)** The rationale clearly lists the misbehavior as the creation and proliferation of the fake account, which is a violation of Rule #24. In this instance, the word "for" is critical as it indicates that the gross misbehavior consists of *something*, which the sentence goes on to explain. The

---

[3] https://dictionary.cambridge.org/us/dictionary/english/misbehaviour
[4] https://www.merriam-webster.com/dictionary/gross

"gross misbehavior" reference indicates that the conduct had reached the standard of misbehavior that would allow for suspension or expulsion under the school's rules.

Plaintiff's misunderstanding of the applicable rule does not mean that the rule itself is vague. In the setting of a public school district with a written handbook, the conduct involved in misbehavior is clear. Schools have a special interest in promoting discipline and decorum, and the rules contained within a school handbook must be read together, in tandem with other rules and established school policies. The context establishes critical nuance which prevents the rule from being vague.

Plaintiff-Appellant insists that the discretion involved with school administrators having the authority to measure whether conduct is "gross" is "wrongful" and allows action on an "arbitrary and discriminatory basis". This could not be further from the truth. The *Fraser* and *Sypniewski* Courts recognized that school districts are bestowed with this discretion by our government on a fundamental level. Students are indeed protected from wrongful, arbitrary, and discriminatory action by an innumerable amount of legal remedies and causes of action, including the First Amendment claims being litigated in this very Appeal.

Plaintiff-Appellant's assault on Rule #9's inclusion in the District Court's analysis is misplaced. It is clear that the same was to be used as an example, rather than a specific adjudication of rule-breaking. Although the District Court noted that

Rule #9 could have been a relevant basis for H.K.'s punishment, its use in that paragraph of Judge Cox's Opinion was to illustrate that the substantive rules in the Freeland Handbook were to be read in conjunction with Rule #10 as a form of sentencing enhancement. This structure is analogous to a habitual offender notice in a criminal law setting. For example, MCL 769.12 sets forth an enhanced sentencing requirement for an individual convicted of three (3) or more prior felonies, but it refrains from forbidding any substantive conduct. Surely, one could not say that MCL 769.12 is vague in what it proscribes, because it is designed to be read in conjunction with Michigan's criminal laws. We find ourselves looking at the same structure in Freeland's Handbook. Rule #10 is simply a notice that significant rule violations will be subject to penalties as severe as suspension or expulsion. Furthermore, The *Kowalski* Court recognized that a school disciplinary rule needn't be as detailed as a criminal law – and thus the kind of discretion that Plaintiff casts as vagary is not only constitutional but is a welcome power of a school district that the Court has "respected" and "valued". *Fraser*, 478 U.S. at 686.

The District Court's decision with regard to Rule #10 of the Defendants-Appellees' Handbook was without error. This Court must affirm that decision and Summary Judgment must be granted to Defendants-Appellees on this issue.

## <u>CONCLUSION</u>

Defendants-Appellees respectfully request that this Honorable Court AFFIRM

the Judgment of the District Court.


Respectfully submitted,


**/s/ Gregory W. Mair**

Dated: December 22, 2022        GREGORY W. MAIR (P67465)
                                Attorney for Defendants
                                300 St. Andrews Road, Suite 302
                                Saginaw, MI  48638
                                (989) 790-0960
                                gmair@owdpc.com

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to 6th Cir.R. 32(a)(7)(c), the undersigned certifies this brief complies with the type-volume limitations of 6th Cir.R. 32(a)(7)(B).

1.      EXCLUSIVE OF THE EXEMPTED PORTIONS IN 6TH CIR.R. 32(f), THE BRIEF CONTAINS:

    A.          6,745 words.

2.      THE BRIEF HAS BEEN PREPARED:

    B.          in proportionally spaced typeface using: "New Times Roman" in font size 14.

**/s/ Gregory W. Mair**

_____

Dated: December 22, 2022        GREGORY W. MAIR (P67465)
                                Attorney for Defendants
                                300 St. Andrews Road, Suite 302
                                Saginaw, MI  48638
                                (989) 790-0960
                                gmair@owdpc.com

## ADDENDUM – RELEVANT DISTRICT COURT DOCUMENTS

| REF. NUMBER | DOCUMENT DESCRIPTION | PAGE ID# |
|---|---|---|
| 12 | Plaintiff's Amended Complaint | 151 |
| 49 | Sealed Deposition Transcripts | Unknown |
| 62 | Opinion and Order of District Court | 1170-1191 |
| 51-6 | May 13, 2019 Letter | 1010 |
| 51-15 | Decision Letter | 1053 |
| 43-6 | Freeland Handbook | 760-61, 765 |
| 37 | Motion for Summary Judgment | 378-403 |
| 40 | Partial Motion for Summary Judgment | 604-622 |